O7NHSheC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 16 (JHR)

5   SERGY SHESTAKOV,

6                                          Conference
                    Defendant.
7   ------------------------------x

8
                                          New York, N.Y.
9                                         July 23, 2024
                                          4:30 p.m.
10

11  Before:

12                  HON. JENNIFER H. REARDEN,

13                                         District Judge

14                        APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  SEBASTIAN SWETT
17       REBECCA DELL
         DEREK WIKSTROM
18       Assistant United States Attorneys

19  GLAVIN PLLC
         Attorneys for Defendant Shestakov
20  BY:  RITA MARIE GLAVIN
         KATHERINE ELLEN PETRINO
21       LEO KORMAN

22

23

24

25

O7NHSheC

1          (Case called)

2          MR. SWETT:  Good afternoon, your Honor.  Sheb Swett,

3   Rebecca Dell, and Derek Wikstorm on behalf of the United

4   States.

5          THE COURT:  OK.  Hello.

6          MR. SWETT:  Hello, your Honor.

7          THE COURT:  All right.

8          MS. GLAVIN:  For the defense, Rita Glavin, along with

9   my colleagues, Katherine Petrino and Leo Korman.  We're here

10  with our client, Sergy Shestakov.

11         THE COURT:  Good afternoon.  Please be seated.

12         So, Mr. Swett, I'm interested in hearing everything

13  that you can tell me on the public record about your July 16

14  request.

15         MR. SWETT:  Your Honor, there's not much more that we

16  can say beyond what's in the public record.  We have become

17  aware of information.  We're looking into whether that requires

18  CIPA litigation.  We are doing that as expeditiously as

19  possible, and if it is required, we would likely seek a

20  Section 2 *ex parte* conference with the Court to explain the

21  situation.  But at this time we really can't say more than

22  what's in the letter.

23         THE COURT:  All right.  I understand.

24         Can you tell me whether you anticipate asking me to

25  hold a hearing under Section 6?

O7NHSheC

| | |
|---|---|
| 1 | MR. SWETT:  Your Honor, I can't say at this time. |
| 2 | THE COURT:  I see that you've asked —— first of all, |
| 3 | both parties here have asked for an adjournment.  So, |
| 4 | obviously, we're going to be talking about dates in a minute. |
| 5 | You asked for an adjournment of the trial and all |
| 6 | associated deadlines by at least six weeks.  Do you know |
| 7 | anything beyond that?  Is it going to take you six weeks to |
| 8 | figure out, to evaluate the information, before you'll be ready |
| 9 | for possible CIPA practice?  Is that still your expectation? |
| 10 | MR. SWETT:  No, your Honor, our expectation is that |
| 11 | within six weeks, to the extent there is CIPA litigation, it |
| 12 | could be briefed, brought to the Court's attention, the Court |
| 13 | would be in a position to rule on it within that time frame. |
| 14 | We are ultimately requesting an adjournment of at least six |
| 15 | weeks from the trial date. |
| 16 | THE COURT:  I see. |
| 17 | MR. SWETT:  We believe that within that time frame we |
| 18 | can be prepared for trial. |
| 19 | THE COURT:  All right.  Well, it's hard for me, based |
| 20 | on what I know at this moment, to evaluate all possible ways |
| 21 | that this might affect the defendant.  I'm not sure —— |
| 22 | information has come to the government's attention.  I'm not |
| 23 | sure what all that might mean.  I don't know if it means |
| 24 | additional discovery material.  I'm not sure, so I don't know |
| 25 | if you were thinking about that when you put six weeks in the |

O7NHSheC

1    letter.  I know you can't really say more, so ——

2    MR. SWETT:  Your Honor, we certainly understand the

3    Court's predicament, and we can't say more other than to say

4    that six weeks for us represents the time frame within which we

5    can be prepared for trial.  Obviously, it's our desire to move

6    forward with trial, but we gave that date so the Court

7    understands what we think is necessary.  Anything less than

8    that, we're afraid that we might not have time to work through

9    the issues.  Obviously, anything beyond that would be subject

10   to the Court's views and the view of the defendant.

11   THE COURT:  All right.  Well, here's what I remember

12   last time we were all together discussing scheduling.  I know

13   that Ms. Glavin had already asked the government about going to

14   trial in September.

15   Wait.  Six weeks from August 6 is —— let's see where

16   that puts us.  A little past the middle of August, I think.

17   MS. GLAVIN:  Your Honor, if I might be heard.

18   THE COURT:  Of course.

19   MS. GLAVIN:  I think the issues, your Honor, are far

20   broader than what the government has represented to the Court,

21   and I want to make a record on this.

22   I will be submitting in the next couple weeks a letter

23   seeking another conference before the Court to address

24   discovery motion practice that has been brought on by some

25   behavior that I have seen in the last six to eight weeks in the

O7NHSheC

1    run-up to preparing for trial, including the government's

2    handling of *Brady* information that was directly exculpatory

3    regarding my client.  I also believe that the government has

4    not and did not ever satisfy its obligations that are required

5    under the DOJ manual and by law with respect to classified

6    information.  And third, I believe the government still has

7    Rule 16 material that we need to prepare our client.

8            If your Honor might recall, the indictment came down;

9    it was unsealed around January 21 of last year.

10           THE COURT:  Yes.

11           MS. GLAVIN:  The first conference was the 9th of

12   February.

13           THE COURT:  Yes.

14           MS. GLAVIN:  At the conference, Mr. DuCharme, who

15   represented Mr. McGonigal —— Mr. DuCharme has a very long and

16   distinguished career dealing with national security issues ——

17   raised immediately with the government that, given that the

18   case involved the allegations that our clients were conspiring

19   with Evgeny Fokin, who is a high-level official at En+, and we

20   have learned from discovery the intelligence community was very

21   interested in and that he was conspiring with Oleg Deripaska

22   who the intelligent community —— he's infamous.  They've been

23   watching him since the Mueller investigation —— Mr. DuCharme

24   said it, and I said it at the first conference, said it again

25   at May 10 at a conference, Mr. DuCharme put it in a letter

O7NHSheC

```
1   before that conference saying there have to be interceptions
2   during the time period of the alleged conspiracy, whether they
3   be phone records, whether they be intercepted conversations
4   that Fokin would have had with En+ officials.  The government
5   refused over and over to tell us anything that they had done,
6   anything that they had asked the intelligence community.
7           We made very specific requests to the government.  We
8   don't believe that those requests were conveyed in the way they
9   should have been conveyed to the intelligence community such
10  that we get the information we're entitled to by law.
11          THE COURT:  What makes you believe that?
12          MS. GLAVIN:  Because there is no ── because En+,
13  counsel for En+, has met with the government.  They met with
14  the government last week.  Notes of that meeting were provided
15  to me on Monday, and they provided exculpatory information
16  about my client that they had obtained.  The information they
17  had is entirely consistent with what my client's defense has
18  been, which is that not only did he not believe that this
19  business intelligence work was for Deripaska, but in truth and
20  in fact, they have evidence within the company, after doing an
21  interview, as to that this was, in fact, business intelligence
22  work that was done for En+ and Rusal and it was done
23  specifically in connection with the litigation that Rusal filed
24  the next year, which is entirely consistent with our theory of
25  the case.
```

O7NHSheC

```
 1                  Pandean Limited, the government has not shown any
 2      connection to Deripaska.  And what we do know —— and I have
 3      raised this with the government over and over again —— is that
 4      the woman who signed the contract is affiliated with En+/Rusal.
 5      She's on public filings for those companies.  I have been
 6      screaming this from the mountaintops to the government.
 7      There's no way that NSA, the CIA, or the defense community
 8      doesn't have Evgeny Fokin's phone records.  And we believe
 9      those phone records will show, or email communication records,
10      and we believe that those communications will show that he was
11      not in contact with Oleg Deripaska during the time charged in
12      this indictment.
13                  That is Brady.  That is so material to the defense.
14      And to ask the government if they've asked, that's not
15      classified, to say, did you make that request?  We have sent
16      them several discovery letters.  All we get is "we've complied
17      with our obligations."  We get turned over to us yesterday the
18      government had a conversation a month ago, a month ago, with a
19      law enforcement official who told them that he is familiar with
20      Deripaska's network.  He had not known or connected that
21      Pandean had anything to do with Deripaska.  But what he did
22      know, because he had done some research, is that he could
23      connect it to Rusal and En+.
24                  That is the truth.  That is the truth of this case,
25      and I have been screaming this from the mountaintop because I'm
```

O7NHSheC

1    standing here with a guy whose life is on the line.  I have

2    been begging the government for this.  They tell me nothing.

3         If the government has not made these prudential search

4    requests, we will make a motion for sanctions.  This is

5    something that gets you in trouble with DOJ, OPR if this was

6    not done under DOJ policy.  This has to be done.  So I (a) want

7    to be able to make some discovery motions to the Court, given

8    what I'm seeing.  We're getting incomplete information about

9    certain phone images, which has caused me to believe that some

10   images of the phone may be in the intelligence community.

11        THE COURT:  Whose phone?

12        MS. GLAVIN:  Mr. McGonigal's and Mr. Fokin's.  Like,

13   we have Charlie McGonigal, they have his laptop.  What we have

14   produced from Charlie McGonigal's laptop is several hundred

15   photographs they took of stuff on the laptop, not the actual

16   images.  Where is that?  We want the laptop and we want a

17   forensic evaluation of that laptop because of where the

18   contract came from, because it appears that it came from Fokin

19   and, we think, came from En+ and Rusal.

20        So I have a whole list of things that I don't think

21   can be resolved now, but to say I am irritated is an

22   understatement a year and a half in.

23        Here is what I would propose, your Honor.  They ask

24   for six weeks.  I want us to come back again before the Court,

25   because if they ask to make a disclosure to you for an *ex parte*

O7NHSheC

1    hearing, I want to be heard, and I also want to do papers into

2    how the process works.  Because what it means, Judge, is you're

3    going to have to put yourself into my shoes.  All right?  And I

4    want you armed with all the questions to ask them, to push

5    them.  Their answers today are insufficient.  I'm begging you

6    to press them and say:  Tell me what the nature of the

7    information was that came to your attention.

8            Let me put it this way:  There was a filing to you on

9    July 15, the government opposing our subpoena to the NSA.  OK.

10           THE COURT:  Yes.

11           MS. GLAVIN:  In that filing, they say we have complied

12   with our discovery obligations, including as to classified

13   information, and then 24 hours later, they need an adjournment.

14   What happened in 24 hours?

15           I am so bothered by this case.  I have told them

16   repeatedly they got it wrong.  So what I need to do for

17   Mr. Shestakov is I need to put together a motion with a listing

18   of all the issues that we are having.  I have sent them

19   discovery letters for requests that I am demanding specific

20   that they make to the intelligence community.  I do want to

21   revisit with your Honor the issue of our motion to compel and

22   narrowing it in anyways that we can.

23           But I have to defend him, and this case has been

24   wrongheaded and —— just let us get the materials that we need.

25   This has been curated, and I've been blocked at every turn.  So

O7NHSheC

```
 1   I plead with you —— I'll give you the page that this is on on

 2   the July 15 letter if you want to take ——

 3           THE COURT:  I know where it is.

 4           MS. GLAVIN:  I am at a loss here, and this is —— we're

 5   18 months in, and what Seth DuCharme said to the Court, I mean,

 6   this was just a foreboding.  In his letter of June 23, 2023, he

 7   just said:  The fact that the government keeps saying to us and

 8   to you no classified information here is not acceptable because

 9   they want to put in statements —— I'll give you an example.

10           So they want to put in statements at trial saying that

11   Evgeny Fokin, coconspirator statements.  To the extent they

12   want to put statements in that they found on Mr. Fokin's phone

13   or text at trial, they have to give me any other statements

14   that they have of Mr. Fokin.  That means they have to ask the

15   intelligence community:  Have you intercepted his email

16   communications during that time period?  Did you intercept him

17   on wiretaps?  If that is the case, they have to review it, and

18   they have to produce.  The fact that it's classified doesn't

19   mean that they don't have their discovery obligations.

20           Oleg Deripaska, they're claiming, is a coconspirator.

21   He's not.  So to the extent there are no communications, all

22   they have to do, go to the intelligence community.  Oleg

23   Deripaska, like, you seized his boat, OK?  You are watching

24   everything he's doing.  They were following Oleg Deripaska.

25   That's why they have two other cases.  They have, I think ——
```

O7NHSheC

1    and I'm going to raise this —— I think the person that I've

2    been trying to subpoena is a cooperator with the government,

3    and they've given me bupkes on her.

4         So I just, your Honor, what I want to say is I want

5    you to ask them more pointed questions about what happened in

6    24 hours.  What the nature of that information was?  How did

7    they learn —— when did they learn about it?  What caused them

8    on July 16 to send the letter to you?  I want you to be as

9    angry as I am because they've been telling you what they've

10   been telling me, and they got it wrong.  They've gotten *Brady*

11   wrong, they've gotten Rule 16 wrong, and they've gotten CIPA

12   wrong.

13        On Rule 16, AUSA Hagan Scotten actually sat here and

14   said to you and to me in a courtroom that the discovery of

15   Charlie McGonigal in D.C., that's not Rule 16.  That has

16   nothing to do with this case; it's a different case.  Yeah, and

17   then we get the discovery, and we see that the agent in this

18   case was using that case to subpoena financial records about

19   Mr. Shestakov.  You can't trust what they say in this case, you

20   can't.  Don't take them at face value, I am begging you.

21        So my point is I want you to ask more questions.  I'm

22   happy to give you the questions.  And then what I'd like to do

23   is I want to take a step back, regroup with my team, and figure

24   out the motions that we're going to make.  It may even mean

25   that I am sending letters to National Security Division at Main

O7NHSheC

```
1    Justice to complain about what has gone on in this case and ask
2    for a meeting.  But this is not acceptable what has gone on
3    here.  You cannot have been in this case for a year and a half
4    —— I mean, Ms. Dell has been on this investigation since the
5    beginning.
6              So my proposal is we come back for status conference,
7    largely because I don't know what this is going to look like,
8    but I know that there's going to be a lot of litigation and
9    motions coming from me, and I'm going to ask for audiences both
10   at the U.S. Attorney's Office and probably at Main Justice.
11             THE COURT:  All right.  Mr. Swett, the government has
12   been accused of getting *Brady* wrong, getting Rule 16 wrong,
13   getting CIPA wrong.  I want to hear your response to
14   Ms. Glavin's arguments, but, first, I do want to ask you how
15   you reconcile the position you took on July 15 with the letter
16   you sent to me on July 16.
17             MR. SWETT:  Your Honor, I think identifying that there
18   may be the need to conduct additional CIPA litigation is
19   entirely consistent with our discovery obligations.  The fact
20   that we are opposing a subpoena for classified information to
21   the NSA and, in part, saying that this case has, at a minimum,
22   had a CIPA 2 conference in front of the Court is not
23   inconsistent with also saying we have identified information
24   that we think may involve CIPA.  I mean, discovery is not a ——
25   it's not a fixed-in-time thing where you have the materials and
```

O7NHSheC

1    the materials are frozen.

2              THE COURT:  I don't actually have it in front of me,

3    but in your opposition to the 17(c) applications, did you say

4    that the government believes it's satisfied its discovery

5    obligations with respect to national intelligence information?

6              MR. SWETT:  Your Honor, I have the letter.

7              MS. GLAVIN:  It's page 3.  For the record, it's

8    ECF 140.

9              MR. SWETT:  It says the government has complied with

10   its discovery obligations.  And, obviously, bringing to the

11   Court's attention the potential need for further CIPA

12   litigation is just that.

13             Everything that Ms. Glavin is complaining about is in

14   response to materials that the government has produced.  And we

15   are more than happy to answer to every single allegation here

16   with respect to *Brady*, with respect to Rule 16, with respect to

17   CIPA.  It's not in front of the Court.  We're here today to

18   schedule, we thought, a trial, hopefully a trial.  If she wants

19   to move on this, she can.  She's written three or four letters

20   and maybe a half a dozen emails to us in the last 24 hours.

21   We're going to respond to them, and we'd like to work through

22   these issues with her.  We'd like to answer her questions.  I

23   don't think she's going to like all of those answers, but we

24   are answering her questions and we are providing her materials,

25   consistent with our obligations and this Court's rulings.  So

O7NHSheC

```
 1    if there are specific questions, to the extent I can, I will
 2    answer them.
 3           But as an initial matter, complying with one's
 4    discovery obligations means alerting the Court that we might
 5    have to go through this process because of information we've
 6    learned, just like complying with one's discovery obligations
 7    means sending materials over if we think that they might
 8    contain exculpatory information, which are now in her
 9    possession.  This is all part of the government complying with
10    its obligations, understanding what it needs to do, and we'll
11    continue to do that, and we'll answer allegations that we
12    haven't done that.
13           THE COURT:  When was the last time you produced
14    discovery material to Mr. Shestakov?
15           MR. SWETT:  Today.
16           THE COURT:  Today?
17           MR. SWETT:  Today.
18           MS. GLAVIN:  Yesterday was a *Brady* production.  So the
19    record is clear, your Honor, this is actually what the
20    government's letter said at EC 140.  I want to make sure this
21    is in the record, to the extent we have to go down an appeal
22    road over suppressing classified information that is *Brady* and
23    Rule 16.  This is what the government told the Court on
24    July 15:
25           "On February 8, 2023, the government requested that
```

O7NHSheC

the Court hold an *ex parte* conference pursuant to Section 2 of

CIPA to consider matters relating to classified information.

(Dkt. No. 20).  That conference occurred on March 8, 2023.  As

discussed at the conference —— and as the government has also

confirmed at other junctures in this case —— the government has

complied with its discovery obligations."

Your Honor, 24 hours later, they're telling you they

haven't, and they need to look into CIPA.

And let's just talk about the discovery obligations.

The discovery obligations, yes, it's a rolling basis.  It's a

living and breathing thing.  But the fact of the matter is we

came here on February 9.  We told the government exactly what

they needed to look for.  The government has known our theory

of the case for over a year, that Mr. Shestakov was not working

with Charlie McGonigal to help out Oleg Deripaska, but that the

person they say is the agent of Deripaska is, in fact, an En+

official named Evgeny Fokin who already has told the government

that he was doing this on behalf of En+.  He told them that

when he was stopped at the border.  And now En+'s counsel

weighed in last week to provide exculpatory evidence to the

government indicating:  You got this wrong.  Rita was right;

Mr. Shestakov was right.

How is it that the government could have investigated

this case, OK, and did not check what phone records do you

have?  As we've scoured the discovery for Mr. Fokin, what phone

O7NHSheC

```
 1   records do they have of him with Mr. Deripaska?  We don't see
 2   any phone records in discovery.  Well, we know from his phone,
 3   but we think we only have part of his phone because we think
 4   they put other parts with the intelligence community.  I think
 5   there is more classified information, and I'm going push on
 6   this and ask your Honor to push on it.
 7           But this is a mealy-mouthed answer, and it's not
 8   acceptable.  They knew what their discovery obligations were.
 9   I think —— what was it Mr. Scotten said?  I think he called it
10   there are small amounts, large amounts.  This is medium amount
11   of discovery, if I remember, and we'd have it within 30 days.
12   And we don't have to worry about this, that, and the other
13   thing.  And we kept asking, and we are here right now because
14   of it.  So I will make applications to the Court on discovery.
15   I think there have been severe discovery violations.
16           With respect to the intelligence community, I don't
17   believe they have asked all the questions of the intelligence
18   community that we asked them to, that they need to ask.  It is
19   inconceivable that NSA and CIA do not have information that is
20   material to preparation of our defense, and that goes to
21   whether or not Mr. Fokin was in touch with Oleg Deripaska
22   during the period of this conspiracy.
23           What's also important is, your Honor, we have, like ——
24   I'll give you another example.  There will be messages between
25   Mr. Fokin and Mr. McGonigal talking about the progress of this
```

O7NHSheC

1    intelligence work.  It then becomes critical for us to know,

2    let's say by way of example, or hypothetical, let's say that

3    Mr. Fokin receives — so he receives, like, sometime in

4    September intelligence materials, background investigation

5    stuff that McGonigal had done as it related to Potanin and

6    Norilsk Nickel.

7         And what's important to us is who was Fokin on the

8    phone with that day after he got the material?  NSA will know

9    that.  Who was he calling in the days?  He then has questions

10   that were interested in this.  So he asked Charlie questions.

11   Then who is Fokin on the phone with?  That's critically

12   important to us, and NSA has it.  There's no question that they

13   have it.  And who was he not on the phone with?  Did he get on

14   the phone and call Deripaska?  We think NSA records are going

15   to show he did not.

16        There are also discussions in August, and there's

17   discussions about how the payment is going to be made to

18   McGonigal.  So the question is, when those discussions are

19   happening, when the discussions — and all we have are mixed

20   text messages when they're happening, OK, so we have haphazard

21   text messages, but we don't have all of them — who then does

22   McGonigal talk to?  That is so critical to our defense.  And

23   the fact that the government — this didn't occur to them when

24   they were investigating this case and they were going to try

25   and say that he was an agent of Deripaska is beyond me.  It's

O7NHSheC

1    beyond me, but I'm certain they didn't ask.

2           And so this is why the Court has CIPA, for you to put

3    yourself in my shoes.  OK.  And they have been saying since day

4    one this doesn't implicate classified information because we

5    declassified, you know, some materials.  Everything about this

6    case implicates national security and intelligence.  And I'm

7    sitting with a man who has pled not guilty and has been

8    screaming this from the hilltops.  They have it or they're able

9    to get it, and they need to get it.

10          THE COURT:  Mr. Swett, what discovery did the

11   government produce yesterday?

12          MR. SWETT:  Your Honor, yesterday we produced notes

13   from a meeting with counsel for En+ in which they relayed the

14   — an interview they had conducted of Fokin.  Then we produced

15   notes from a teleconference with an FBI agent.

16          THE COURT:  All right.  So notes from a meeting with

17   counsel for En+ concerning an interview of Fokin, is that what

18   you said?

19          MR. SWETT:  Yes, Evgeny Fokin.

20          THE COURT:  When was the interview of Fokin?

21          MR. SWETT:  I don't know when the interview was.  I

22   believe the meeting with counsel was Thursday or Friday of last

23   week.

24          THE COURT:  All right.  And notes from a conference

25   with an FBI agent, that was the other component?

O7NHSheC

1           MR. SWETT:  Yes, your Honor.

2           THE COURT:  When was the conference with the FBI

3    agent?

4           MR. SWETT:  June 25, I believe.

5           THE COURT:  All right.  Yes, go ahead.

6           MR. SWETT:  I just do want to make it clear, your

7    Honor, that the defense theory that Ms. Glavin just presented

8    to you comes from materials that have been produced throughout

9    the course of this case.  The interview of Evgeny Fokin at the

10   border, where he said that he was coming to the United States

11   to do work for En+, the government produced that in its first

12   discovery production.  The records showing that Arina Lazarou

13   had been director of companies affiliated with En+, that was

14   produced by the government in, I think, one of its first

15   discovery productions.  So, again, you have an account of the

16   government's suppressing information based on materials that

17   the government has been producing throughout this case.

18           I think the only thing I will say with respect to the

19   classified materials is that in the motion for the Rule 17

20   subpoena, the defendant made a case for why there must be these

21   materials, and that argument is just pure rank speculation.

22   And obviously, there's very little that we can say about the

23   process here because CIPA exists to cover these types of

24   materials.  But Ms. Glavin has stood up in court today and has

25   said these materials absolutely exist, and as far as we can

O7NHSheC

1  tell, it is based on nothing more than wishful thinking or

2  supposition.

3       So, again, none of this is actually before the Court

4  right now.  We've received a lot of letters to respond to,

5  which we will respond to.  To the extent she moves for relief

6  from the Court, we will respond to those motions.  For the time

7  being, though, I think we don't think it makes sense to

8  continue litigating this issue that's not ripe, that hasn't

9  been briefed, that we haven't even had a chance to confer on

10  between parties, and so we would ask that the Court move on to

11  scheduling matters in this case.

12       THE COURT:  Well, Mr. Swett, I was giving you an

13  opportunity to respond to the allegations that have been made.

14  So if you don't have anything more to say right now, then

15  that's OK with me.  I'm not sure how much further I can go

16  without papers in front of me anyway.

17       MR. SWETT:  Your Honor, we certainly vehemently deny

18  the accusation that there are sanctionable discovery violations

19   here.  We have received letters from Ms. Glavin laying out

20  some of what she has described to you today, which we think is

21  shaded to the point of unrecognizability.

22       So the bottom line is that we have produced materials

23  that we are obligated to under *Brady*.  We have complied with

24  our discovery obligations.  Certainly, we have complied with

25  the Court's rulings —— and I think much of what Ms. Glavin is

O7NHSheC

1    complaining about is that she's seeking to undo the rulings in

2    this case — and we continue to do that.  And when we have new

3    materials or new information, we provide them, and that is

4    completely consistent with a prosecution team attempting and

5    complying with its obligations.  It is the opposite of what you

6    would expect from a prosecution team that is suppressing

7    information and that is not complying with its obligations.

8           THE COURT:  All right.  Ms. Glavin, the government

9    referred to a, to paraphrase, flurry of communications that

10   they received from you just yesterday before this conference

11   today.

12          MS. GLAVIN:  Yes.

13          THE COURT:  How much of what you're telling me today

14   relates to communications that you sent yesterday and haven't

15   gotten responses to yet?

16          MS. GLAVIN:  Well, there is also the communication I

17   sent to them with also a long list of discovery requests on

18   July 15.  Those aren't the only ones.  They got two yesterday

19   that we had been working on but were a direct result of having

20   gotten the *Brady* disclosures yesterday.

21          One thing I want to say about the *Brady* disclosure of

22   the discussion they had with the FBI on June 25, why it just

23   has me so angry is that at the time that FBI agent told this

24   prosecution team, OK, on June 25, that he investigates Oleg

25   Deripaska; he is familiar with Oleg Deripaska's networks.  He

O7NHSheC

1    doesn't know Pandean.  He hasn't heard of Pandean.  Pandean's a

2    central part of this.  We've been saying since day one Pandean

3    has nothing to do with Oleg Deripaska.  It has to do with En+

4    and Rusal.

5           This agent tells them that and also says:  And I was

6    been able to link Pandean and Arina Lazarou to En+ and Rusal.

7    When the government says today, oh, but the reason Ms. Glavin

8    knows this is because of what we gave her in discovery, you

9    want to know those documents that they gave me that are

10   documents indicating that Pandean or that Arina Lazarou ——

11   actually, I should say Arina Lazarou was affiliated with Rusal

12   and En+?  They're not in English.  The government did not even

13   translate them.

14          I don't believe that the government knew until I

15   pointed it out, because we got them translated, I don't think

16   they knew that En+ had a public filing from 2021, when this

17   conspiracy took place, that says Arina Lazarou is an affiliated

18   entity.  If they did, they most certainly should have

19   translated it and given it to me, and if they did know that

20   before they indicted, they should have done a lot more homework

21   than what they did.

22          So was it in the mass amount of discovery that we got?

23   Uh-huh.  Was, I think, the two public filings we looked at, was

24   it in English?  Nope.  Did they translate it?  Nope.  That's

25   what we're dealing with here, and that scares me to no end.  I

O7NHSheC

1    have never been in a situation like this in my 14 years as a

2    defense lawyer. I just can't believe we're 18 months into this

3    case, and the government's like, oh, we complied with our

4    discovery obligations. When? Oh, and if you turn this over to

5    me the day before trial, well, we complied with our

6    obligations? Where have they been, and what have they been

7    doing?

8            So I get it. You you've listened to me go off about

9    this. I'm making my record because I hope that this does not

10   end up in the Second Circuit. I hope the right thing gets done

11   here. But this record has to be made. It has to be made over

12   and over. And I do intend to make filings. We have been

13   asking them questions for months, and we get the same answer

14   that you're getting today, which is unacceptable. We just got:

15   We complied with our discovery obligations. Don't mind us.

16   Don't look under the hood. You can trust us. We're the

17   government. We can't, not what I've seen in this case. You

18   cannot trust them in this case.

19           THE COURT: All right. Mr. Swett, we started with you

20   telling me that you thought you needed about six weeks to go

21   through the entirety of the CIPA practice that you're imagining

22   might need to take place, right?

23           MR. SWETT: Yes, your Honor.

24           THE COURT: So when between now and six weeks from now

25   can you tell me more? When are we going to have a next step?

O7NHSheC

1          MR. SWETT:  Your Honor, I think it makes sense to

2     schedule a Section 2 CIPA conference so that we can provide

3     more information.  We would tentatively propose a week from

4     this Friday.  However, I think we'd like to just discuss with

5     folks at the National Security Division the timing of that.  So

6     we think by then we will be in a position to give the Court

7     more information about the information in our July 16 letter.

8          THE COURT:  All right.  Well, since I am currently in

9     trial with some of your colleagues and the trial is expected to

10    go into next week, I don't want to schedule anything for

11    Friday, August 2.  But I would propose a date that I know works

12    for everybody, and that is Tuesday, August 6.

13          MR. SWETT:  That's fine, your Honor.

14          THE COURT:  All right.

15          MS. GLAVIN:  Your Honor, with respect to that, on the

16    CIPA conference, the defense would also like to make a similar

17    request, and I just — if I could just consult with my team on

18    the date?

19          THE COURT:  Yes.

20          (Counsel conferred)

21          MS. GLAVIN:  Your Honor, would it be possible to do it

22    on Wednesday, the 7th, instead?

23          THE COURT:  That's fine with me.

24          So are you proposing — what are you proposing?

25    Back-to-back CIPA conferences?

O7NHSheC

1          MS. GLAVIN:  Yes, your Honor.

2          THE COURT:  What would you have to tell me in a CIPA

3   conference at this point?

4          MS. GLAVIN:  I think what we would do is we would put

5   to you the questions —— I think I would give you more color on

6   the defense and what we're seeing and pulling together so that

7   you are prepared to ask the government questions.  This would

8   be similar to what we did last year.

9          THE COURT:  Yes, yes.

10         MS. GLAVIN:  But I want some time to think about it

11  when with the team and how I want to structure —— like, we will

12  put something to the Court, probably an *ex parte* communication,

13  about the conference beforehand.

14         THE COURT:  All right.  So let's all tentatively hold

15  Wednesday, August 7, then.

16         All right.  Ms. Glavin, when are you going to start

17  rolling your motions to me?

18         MS. GLAVIN:  Your Honor, it will be this month —— not

19  this month, July.  It will be in August.  I'm just —— I think

20  my team right now is dragging a little bit because we are

21  switching from trial prep.

22         And also to be clear for the record, the Court is

23  adjourning the trial?

24         THE COURT:  Yes, I was getting to that.  Clearly, we

25  are adjourning the trial.

O7NHSheC

1          And also to rewind to where we were about half an hour

2     ago, I know that, last time we talked about scheduling, you

3     were proposing September for trial.  I couldn't do September.

4     I know that Mr. Wikstrom had a trial scheduled for October and

5     possibly Ms. Dell also.  Is that still the case?

6          MS. GLAVIN:  Judge, my fall is gone.  I'm in

7     depositions throughout the fall that I'm taking in two

8     high-profile matters.  Like, the fall is gone for me now.  I

9     scheduled everything.

10          THE COURT:  Through when, would you say?

11          MS. GLAVIN:  Through December.  Through December.

12     That's why I would ask that we come back, because I do think

13     we're going to be in litigation over this.

14          Oh, and Mr. Korman reminds me that he and his wife are

15     expecting a baby.  I'm sorry.

16          THE COURT:  Congratulations.

17          MR. KORMAN:  Thank you.

18          MS. GLAVIN:  In November.  So that's why I would

19     prefer that we come back when I can get this shored up.  You

20     know, we could come back maybe the first week of September.

21     But given the importance of this to Mr. Shestakov, and he and I

22     have had many discussions about this, like, he is very, very

23     concerned about what is out there as an eye that we don't have

24     and wants to make sure that we get this right, and I could not

25     agree with him more.

O7NHSheC

1          THE COURT:  Well, I would have hoped not to put trial

2     off past the end of this year.  I would like to — you're going

3     to get back to me, I guess, both sides.  The government is

4     prepared to go forward with a CIPA conference on August 7.  Can

5     you say that firmly right now?

6          MR. SWETT:  Your Honor, certainly, we will be

7     available.  I just want to make sure that we have a chance to

8     confer with our counterparts.  I expect we could give you a

9     firm answer by the end of today or early tomorrow.

10          THE COURT:  That would be fine.

11          Then, Ms. Glavin, what about you?  When do you think

12     you'll be able to get back to me about the 7th?

13          MS. GLAVIN:  Oh, I'm fine.  We can do it on the 7th.

14          THE COURT:  You can?

15          MS. GLAVIN:  Yeah.  I mean, yes, yes, 7th is fine.  If

16     we could do it late in the day, that would be great.

17          THE COURT:  Late in the day?  Like what are you

18     thinking?

19          MS. GLAVIN:  Same time.  I don't — oh, I didn't think

20     about that.  Say 3 o'clock?

21          THE COURT:  All right.  So we'll block out 3:00 to

22     5:00, I guess, on the 7th.  I assume an hour each will be

23     enough.

24          MR. SWETT:  An hour should be fine for the government.

25          And just to be clear, we will have an update.  I don't

O7NHSheC

 1   know if we will have fully concluded whether or not CIPA

 2   litigation is necessary, but, obviously, the information that

 3   we have at that time we'll be prepared to share with the Court.

 4                THE COURT:  All right.  Very good.

 5                MS. GLAVIN:  To the extent, your Honor ——

 6                THE COURT:  Yes.

 7                MS. GLAVIN:  —— that the government does not think

 8   CIPA litigation is necessary, we will be making motions, very

 9   specific, regarding what they need to be doing with the NSA and

10   CIA.

11                THE COURT:  Well, you're making motions regardless.

12                MS. GLAVIN:  Yes.

13                THE COURT:  All right.  Well, does the government have

14   an application?

15                MR. SWETT:  Well, your Honor, we would certainly move

16   to exclude time at least through August 7, but I think we would

17   also ask the Court to set a trial date even if it is in

18   December.  People's schedules only get busier the longer we

19   wait.  So we're prepared to try this case in —— towards the end

20   of this year, and we would like to work out a trial date today.

21                MS. GLAVIN:  Your Honor, here are the issues:  One is

22   I do want to talk with —— we're here basically because of the

23   government not doing what they were supposed to have done

24   months ago, and I want to talk with my team.  I want to talk

25   with Mr. Shestakov.  I also think that we may have applications

O7NHSheC

1    for Rule 15 depositions in connection with this case, including

2    as it relates to Mr. Fokin, and that would be happening outside

3    the United States.

4            MR. SWETT:  Your Honor, I think Ms. Glavin first

5    raised the possibility of Rule 15 depositions in January of

6    this year, so I don't see that as a compelling reason to

7    adjourn this without a firm trial date.

8            MS. GLAVIN:  This is amazing to me.  The government

9    produces information to me yesterday that Mr. Fokin, who they

10   tried to exclude any information about him telling the

11   government the truth at the border, even though they had

12   information in their possession as of June 25, that ——

13   consistent with our defense.  They get information from the

14   company last week that Mr. Fokin was recently spoken to, and

15   what he had to say was pretty darn exculpatory to Mr. Shestakov

16   in every way, shape, and form.  And now they're like, oh, it

17   shouldn't take that long.  OK.  OK.  Because I think we may

18   have more witnesses as a result of this.

19           THE COURT:  All right.  I do agree that if we don't

20   pick a trial date now, the next time this comes up ——

21   Ms. Glavin, I know your schedule —— we're going to be looking

22   at, like, next April, May.  We have to put something down now,

23   and we'll see how things unfold from here, both in terms of

24   CIPA practice and your motions.

25           But what about Wednesday, December 4?

O7NHSheC

1          MS. GLAVIN:  Your Honor, I cannot do it this year.

2     There are depositions I have in December.  I'm also going away

3     in December, and I also expect this trial — the government, I

4     think, said they thought it would go into a second week.  I

5     think it's going to be a three- to four-week trial.  So I

6     cannot do it, and I would like to just speak with my colleagues

7     because I need to know when Mr. Korman will be back, because

8     he's been a critical part of preparing this and part of our

9     team, and I'm expecting he's going to be trying the case with

10    me.  So I just need to check with everyone's availability.

11         THE COURT:  All right.  Just a moment.

12         So, Mr. Swett, do you agree that it's possible this

13    single-defendant case could — the trial could run beyond two

14    weeks?

15         MR. SWETT:  Well, your Honor, I think the government's

16    case-in-chief will last no more than two weeks and could be

17    only slightly more than one week.

18         THE COURT:  All right.  Ms. Glavin, why don't you

19    confer with your team now, please, and —

20         MS. GLAVIN:  Can we just step outside, your Honor?

21         THE COURT:  Yes, you may.

22         (Recess)

23         MS. GLAVIN:  So, your Honor, I had a chance to confer

24    with Mr. Shestakov, as well as my team, and between Mr. Korman

25    and his wife — the baby is due late November.  I am also in —

O7NHSheC

1    and he will be gone for the month of December.  I am taking a

2    very important deposition that is going to require weeks of

3    preparation in December, actually, December 11.  And so the

4    date we all feel comfortable with, and Mr. Shestakov, is a date

5    in February.  We propose the second week of February.

6             THE COURT:  While I check on that on my end,

7    Mr. Swett, what does that look like for you?

8             MR. SWETT:  We're available.

9             THE COURT:  All right.

10            All right.  Wednesday, February 12 —— wait.  How many

11   weeks are we holding now?  Three?

12            MS. GLAVIN:  I would hold four, your Honor, between

13   jury selection and soup to nuts.

14            I just —— with respect to starting on a Wednesday, I

15   did have one question for the Court.

16            THE COURT:  Yes.

17            MS. GLAVIN:  In terms of starting on a Wednesday, I

18   don't know how the clerk's office does this, but to the extent

19   the Wednesday jury pool has the people who have been the

20   subject of for-cause or peremptory challenges, and that is

21   going to be the majority of my jury pool, I do have an issue

22   with that and would ask that —— unless fresh pools are brought

23   each day of the week, I think that that puts the defense at

24   quite a disadvantage, and I'd rather that we start on a Monday.

25            THE COURT:  I'm willing to start on a Tuesday.  It's

O7NHSheC

1    very hard to start on a Monday because that's when most people

2    start.  That's hard for the jury department, so I'd rather

3    start on a Tuesday.

4              MS. GLAVIN:  You realize that the defense gets more ——

5    well, I don't mean it to come out that way.  But we end up with

6    a lot of defense rejections in our pool come Tuesday.  The

7    defense has more challenges than the government, and so

8    therefore, what ends up in that Tuesday pool —— I'm very

9    familiar with this from having been at the office, and there

10   was used to be a saying that we love the Wednesday jury pools

11   because you had all the defense rejections from Monday and

12   Tuesday, which is why I would prefer to start on a Monday.

13             I get it.  I get it.  That's when everyone else starts

14   their trials, but to me it puts us in the fairest position for

15   what we're going to get in the pool.

16             THE COURT:  All right.  Mr. Swett, any objection?

17             MR. SWETT:  No, your Honor.  We're happy to start any

18   day of the week.

19             THE COURT:  All right.  We can start on Monday,

20   February 10.

21             MS. GLAVIN:  Thank you, your Honor.  I appreciate it.

22             THE COURT:  And I will hold through Friday, March 7.

23             MS. GLAVIN:  Thank you, your Honor.

24             THE COURT:  All right.  Mr. Swett, now do you have an

25   application?

O7NHSheC

1        MR. SWETT:  Yes, your Honor.  We would now ask for an

2   exclusion of time under the speedy trial clock through

3   February 10, 2025.  That clock will toll if the defendant files

4   motions, but anyway, for the many reasons we've discussed

5   today, we think it's in the interest of justice and outweighs

6   the defendant's and the public's interest in a speedy trial.

7        MS. GLAVIN:  No objection.

8        THE COURT:  All right.  Hearing no objection, I hereby

9   exclude time between today and the start of trial scheduled for

10   February 10, 2025, under the Speedy Trial Act pursuant to

11   18 U.S.C. Section 3161(h)(7)(A) in order to permit the

12   government to evaluate the need for possible CIPA litigation

13   and to allow the defense time to brief the issues that the

14   defense has raised today and to prepare for trial and for me to

15   decide motions.

16        I find the exclusion to be in the interest of justice

17   and to outweigh the best interests of the public and the

18   defendant in a speedy trial.

19        Anything else for right now?

20        MR. SWETT:  No.  Thank you, your Honor.

21        THE COURT:  All right.  Thank you.

22        MS. GLAVIN:  Not for the defense.  Thank you.

23        (Adjourned)

24

25